**AMENDED OPINION**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SECRETARY OF LABOR, MINE
SAFETY AND HEALTH ADMINISTRATION
(MSHA),
Petitioner,

v.

No. 98-1613

CONSOLIDATION COAL COMPANY;
ROBERT WYATT; DANNY E.
CRUTCHFIELD; FEDERAL MINE SAFETY
& HEALTH REVIEW COMMISSION,
Respondents.

On Petition for Review of a Decision of the
Federal Mine Safety & Health Review Commission.
(94-377-WEVA, 94-379-WEVA, 94-380-WEVA)

Argued: March 3, 1999

Decided: May 27, 1999

Before TRAXLER, Circuit Judge,
VOORHEES, United States District Judge for the
Western District of North Carolina, sitting by designation,
and FABER, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jerald S. Feingold, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Petitioner. L. Joseph Ferrara, JACKSON & KELLY, Washington, D.C., for Respondents. **ON BRIEF:** Marvin Krislov, Deputy Solicitor for National Operations, Edward P. Clair, Associate Solicitor, W. Christian Schumann, Counsel, Appellate Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Petitioner. David J. Hardy, JACKSON & KELLY, Charleston, West Virginia; Elizabeth S. Chamberlin, CONSOL, INC., Pittsburgh, Pennsylvania, for Respondents.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This case, which arises under the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C.A. § 801-962 (West 1986 & Supp. 1998), concerns the Secretary of Labor's ("Secretary") investigation of a methane explosion occurring at a coal mine owned and operated by Consolidation Coal Company ("Consolidation"). At the conclusion of the investigation, the Secretary filed charges under the Mine Act against Consolidation and certain management personnel,[1] alleging failure to maintain an adequate ventilation system at the mine. The Administrative Law Judge ("ALJ") dismissed the charges on the ground that they were unsupported by the record. The Secretary appealed to the Federal Mine Safety and Health Commis-

_____

[1] Respondents Robert G. Wyatt and Danny E. Crutchfield were made parties by virtue of their management positions with Consolidation. Throughout this opinion, we shall refer to all Respondents collectively as "Consolidation."

2

sion ("Commission"), which affirmed the ALJ's decision. This petition for review followed. Because we agree with the Commission's finding that the ALJ's decision was supported by substantial evidence, we deny the Secretary's petition for review.

I.

In December 1992, Consolidation engaged in retreat mining at the 2-1/2 section of the Amonate No. 31 Mine ("the mine"), an underground coal mine in McDowell County, West Virginia. At that time, the continuous mining machine employed in the 2-1/2 section "gassed off," i.e. shut down, several times due to heightened methane levels in the mine. Work within the 2-1/2 section temporarily ceased, but resumed when methane levels were reported as back to normal. Shortly thereafter, loud noises were heard emanating from the roof of the mine. Ultimately, an explosion occurred injuring several Consolidation employees.

The Secretary conducted a post-explosion investigation and charged Consolidation with utilizing an ineffective bleeder system,[2] which the Secretary asserted was inadequate to ventilate the mine as required by regulations promulgated pursuant to the Mine Act:

> During pillar recovery a bleeder system shall be used to control the air passing through the area and to continuously dilute and move methane-air mixtures and other gases, dusts, and fumes from the worked-out area away from active workings and into a return air course or to the surface of the mine.

30 C.F.R. § 75.334(b)(1) (1992).

Specifically, the Secretary alleged the following:

_____

[2] A "bleeder system" is a method of ventilation utilized during retreat mining to sweep methane away from the active working area, and dilute methane in the adjacent previously worked-out area ("gob") to safe levels of concentration.

3

An adequate bleeder system was not provided to control the air passing through the worked-out area of the 2-1/2 section, MMU 015, to continuously dilute and move away methane-air mixtures from the active workings and into a return air course. Air measurements taken by [the Secretary's] ventilation specialists indicated that only 2,037 cubic feet per minute of air was passing through the bleeder regulator. This condition was revealed during [the Secretary's] accident investigation after a methane explosion had occurred.**3**

In a second charge, the Secretary alleged that Consolidation utilized improper means for evaluating its bleeder system under 30 C.F.R. § 75.364(a)(2) (1992), which provides, in relevant part, that:

At least every 7 days, a certified person shall evaluate the effectiveness of bleeder systems used under § 75.334(b) and (c) as follows:

. . .

At least once each week, bleeder entries used as part of a bleeder system under § 75.334, shall be traveled in their entirety, or to locations approved in the ventilation plan where measurements of methane and oxygen concentrations and a test to determine if the air is moving in its proper direction can be made.

30 C.F.R. § 75.364(a)(2)(iii).

Specifically, the Secretary alleged that:

Based on evidence obtained during this accident investigation, it is determined that adequate weekly examinations

_____

**3** According to the Secretary, deficiencies in Consolidation's bleeder system created an accumulation of methane in the gob causing the explosion in the 2-1/2 section. Consolidation argued in opposition that the explosion resulted from a sudden inundation of methane from a crack in the roof of the gob which, according to Consolidation, was in no way related to any alleged deficiencies in its bleeder system.

4

were not being made to determine the effectiveness of the 2-1/2 section bleeder system. Statements given by company officials, Bob Wyatt, superintendent, and Danny Crutchfield, mine foreman, were that no one was examining the bleeder regulator and that the area was inaccessible. The approved ventilation map indicates that the back side of 2-1/2 section, MMU 015, can be examined. This is a contributing factor to the methane explosion which occurred on 2-1/2 section, MMU 015, December 29, 1992.

The Secretary's charges against Consolidation were brought before an ALJ in June 1995. Before the ALJ, expert Gary Wirth ("Wirth") and Inspector William Uhl ("Uhl") provided testimony supporting the Secretary's position. After considering the Secretary's arguments, the ALJ found the testimony of Wirth and Uhl not credible and concluded that the Secretary's case, overall, was an "attempt[ ] to establish an inadequate bleeder system through post-ignition investigative assumptions, theories, and conclusions based on conjecture, speculation, and contradictory information and testimony that [he found] lacking in credible evidentiary support." Accordingly, the ALJ vacated the Secretary's orders and dismissed the Secretary's charges premised on § 75.334(b)(1) and § 75.364(a)(2) respectively.

The Secretary appealed the ALJ's decision to the Commission, contending that the ALJ misconstrued the Secretary's theory regarding the § 75.334(b)(1) charge. More precisely, the Secretary alleged that the ALJ's inability to comprehend her case led the ALJ to improperly discredit the testimony of Wirth and Uhl. Additionally, the Secretary requested remand of the § 75.364(a)(2) charge on the ground that the ALJ did not rule on a specific aspect of the charge involving Consolidation's failure -- the week before the methane explosion -- to conduct properly a single cross-sectional reading.[4]

The Commission issued a two-fold ruling. First, the Commission considered the Secretary's appeal and reached a 2-2 tie with respect to the § 75.334(b)(1) charge. Under Commission precedent, an evenly

_____

[4] A cross-sectional reading is obtained by measuring the air-flow at a bleeder system's major entries. Consolidation took cross-sectional readings to evaluate the bleeder system utilized on the 2-1/2 section.

5

split decision results in affirmance. See Pennsylvania Elec. Co., 12 F.M.S.H.R.C. 1562, 1563-65 (1990). Thus, the ALJ's decision on the § 75.334(b)(1) charge was affirmed. Second, the Commission decided by a 3 to 1 vote that the ALJ committed no error in declining to rule on an issue arising under § 75.364(a)(2) that was not encompassed by the Secretary's charge. The Secretary now petitions this court for review of the Commission's decisions.

II.

Under the Mine Act, we must uphold decisions of the Commission if supported by substantial evidence and reached by applying the correct legal standard. See 30 U.S.C.A. §§ 816 (a)(1). Substantial evidence, described as "more than a scintilla but less than a preponderance," Elliott v. Adm'r, Animal & Plant Health Inspection Serv., 990 F.2d 140, 144 (4th Cir. 1993), is"`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). We "appl[y] the same standard of review, including substantial evidence as to factfindings, as does the[Commission]. . . ." Kellough v. Heckler, 785 F.2d 1147, 1150 n.3 (4th Cir. 1986) (reviewing decision of the Benefits Review Board), when reviewing the underlying decision of the ALJ. See 30 U.S.C.A. § 823(d)(2)(A)(I). A review for substantial evidence does not involve re-weighing conflicting evidence, making credibility determinations, or substituting our judgment for that of the ALJ. See See v. Washington Metro. Area Transit Auth., 36 F.3d 375, 380 (4th Cir. 1994) (reviewing decision of the Benefits Review Board).

A.

We first address the Secretary's charge of inadequate ventilation, brought pursuant to 30 C.F.R. § 75.334(b)(1). With regard to this charge, the Secretary argues at some length that the ALJ unfairly discredited the testimony of Wirth and Uhl due to his confusion over the issues for resolution.

The Secretary bears the burden of proving an alleged violation of the Mine Act by a preponderance of the evidence. See Garden Creek Pocahontas Co., 11 F.M.S.H.R.C. 2148, 2152 (1989). We are mindful

that the Secretary presents a plausible argument in support of her claim of inadequate ventilation. But the strength of the Secretary's case alone cannot influence this court to turn a blind eye toward substantial evidence supporting the ALJ's decision. In other words, we must reject even the most plausible of theories offered by the Secretary when the ALJ's contrary findings are supported by substantial evidence. See Washington Metro. Area Transit Auth., 36 F.3d at 380. And, "[w]e must defer to the ALJ's credibility determinations and inferences from the evidence, despite our perception of other, more reasonable conclusions from the evidence." Id.

Bearing in mind the foregoing, we acknowledge that while decisions of an ALJ are entitled to deference, they are not completely immune from review. An ALJ "cannot reject evidence for no reason or for the wrong reason. . . ." Id. at 384 (internal quotations omitted). Rather, an ALJ is "statutorily required to include a discussion of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." Id. (quoting 5 U.S.C.A. § 557(c)(3)(A)(West 1996)). "Strict adherence to this statutorily-imposed obligation is `critical to the appellate review process. . . .'" Washington Metro. Area Transit Auth., 36 F.3d at 384 (quoting Director, OWCP v. Congleton, 734 F.2d 428, 429 (6th Cir. 1984)). We thus require that an ALJ make specific references to the evidence supporting his decision as part of the ALJ's "duty of explanation[,]" Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1980), and that he discuss his reasons for rejecting evidence in the record which contradicts his decision, see Washington Metro. Area Transit Auth., 36 F.3d at 384.

As the Secretary correctly posited, a determination of the cause of the explosion was not the issue. The question was whether the bleeder system utilized in the 2-1/2 inch section on the day of the explosion was inadequate "to continuously dilute and move methane-air mixtures and other gasses, dusts, and fumes from the worked-out area . . . ." In this appeal, the Secretary faults the ALJ for his questions and findings regarding the explosion itself and argues that such reflects a loss of focus on the part of the ALJ. While the court agrees that the Secretary's formulation of the issue is correct, the court disagrees with the conclusion that the ALJ lost sight of it.

7

The record is replete with testimony regarding the adequacy of the bleeder system. While it may have been possible to receive this evidence to the complete exclusion of any mention of the explosion, given the context in which the Secretary's investigation occurred, we can easily understand how difficult it would have been for the ALJ to divorce from the proceedings entirely any mention or consideration of the explosion.

A fair reading of the ALJ's 81-page opinion makes painstakingly clear that he fulfilled his responsibilities. Notably, the ALJ did not dismiss the Secretary's charges in summary fashion. Instead, he provided a detailed analysis supporting his finding that the Secretary's evidence -- including the testimony of the Secretary's experts Wirth and Uhl -- was not credible. In particular, the ALJ noted Wirth's failure to review certain test records which were relevant to the determination concerning the adequacy of the bleeder system. The ALJ observed that, "[a]lthough Mr. Wirth was of the opinion that high methane readings `probably' would have occurred at the drill holes on the day of the ignition, and that the presence of high methane at the drill holes would have been discoverable by the weekly examinations, he confirmed that he never reviewed the section weekly examination books or the pre-shift or on-shift books for the days preceding the ignition to determine whether air readings were taken at the intake because he did not believe they were relevant." The ALJ found additionally problematic Wirth's decision not to include the results of certain bottle samples which indicated "that methane was exiting the gob through the drill holes." Apparently, Wirth failed to explore potentially valuable data solely as a result of his questionable determination that this information was not relevant. These and other aspects of Wirth's testimony led the ALJ to conclude that he could not "accept it as reasonable evidentiary support for any conclusion that there was in fact a lack of sufficient air in the gob to dilute and carry away methane through the return."

When we look at the record as a whole, and particularly keeping in mind that the cause of the explosion was unknown, we have no difficulty in concluding that the ALJ understood his mission and rendered a decision on the adequacy of the bleeder system without regard for whether any alleged deficiency was a cause of the explosion.

8

Indeed, counsel for the Secretary several times during the hearing put on the record statements of the issues the Secretary was pursuing.

We further believe, based upon our survey of the entire record, that the ALJ appreciated and understood that proper control of the accumulation of methane in the worked-out area meant more than directing air flow into the gob and that the critical inquiry was whether the air flowed through the gob in such a manner as to adequately ventilate the entire worked-out area. Admittedly there are instances in the record indicating consideration of issues ultimately irrelevant to the dispositive question, and there is evidence which would support a conclusion different from that reached by the ALJ; but we cannot say from our review of the lengthy record, from which resulted a detailed order, that the analysis by the ALJ and his conclusion merits a reversal.

Our standard of review dictates that we may not substitute a competing view of the facts for the reasonably reached view of an ALJ. See Washington Metro. Area Transit Auth., 36 F.3d at 380. Accordingly, we affirm the Commission's decision, which, in turn, affirmed the ALJ's decision to dismiss the Secretary's charge brought pursuant to 30 C.F.R. § 75.334(b)(1).

B.

We next address the Secretary's request that this case be remanded to the ALJ for consideration of the charge brought pursuant to 30 C.F.R. § 75.364(a)(2). According to the Secretary, this charge encompassed an allegation that Consolidation's failure to properly conduct a single cross-sectional reading was contrary to regulations requiring weekly evaluation of the bleeder system. The Secretary alleges that remand is appropriate because the ALJ made no ruling regarding this aspect of the charge.

Under the Mine Act, a citation issued by the Secretary must "describe with particularity the nature of the violation." 30 U.S.C.A. § 814(a). It is undisputed that the Secretary's § 75.364(a)(2) citation described with particularity the Secretary's allegation as originally charged, namely that cross-sectional readings were altogether inappropriate as a mechanism for evaluating the bleeder system utilized

9

on the 2-1/2 section of the mine. It is markedly less apparent, however, that the Secretary's allegations on appeal to the Commission and to this court -- as reformulated to embody an isolated incident where Consolidation failed to properly administer a cross-sectional reading -- were reflected in the Secretary's citation. Considering the record as a whole, we find that the Secretary's § 75.364(a)(2) citation did not include an allegation regarding Consolidation's failure to properly conduct one specific cross-sectional reading taken the week prior to the accident.

As written, the Secretary's § 75.364(a)(2) charge condemns cross-sectional readings in any form. In other words, the charge can be read to convey no less than the Secretary's sentiment that any and all cross-sectional readings -- even if properly taken-- were inadequate for testing ventilation on the 2-1/2 section. The record also reflects that the material issue presented to the ALJ by the Secretary was whether the use of cross-sectional readings was appropriate on the 2-1/2 section at all. Although Wirth and Uhl made scattered references to a specific cross-sectional reading taken on a single occasion during the week prior to the accident, Wirth never reviewed the pre-shift or on-shift books for the days preceding the ignition because he perceived such records to be irrelevant. And, Uhl"repeatedly characterized any failure by Consol[idated] to [properly] make the last weekly [cross-sectional] reading before the accident as irrelevant to the Secretary's case, because it was the Secretary's position that even a complete cross-sectional reading was, under the circumstances, a violation of Section 75.364(a)(2)." In light of the foregoing, we affirm the Commission's refusal to remand this case to the ALJ for consideration of a § 75.364(a)(2) violation which was neither alleged in the Secretary's citation nor raised before the ALJ.

III.

In sum, we conclude that the Commission's findings regarding the adequacy of Consolidation's bleeder system and cross-sectional readings were supported by substantial evidence. Accordingly, we deny the Secretary's petition for review.

AFFIRMED

10